JOHN BALAZS, Bar No. 157287
Attorney at Law
916 2nd Street, Suite F
Sacramento, CA 95814
Telephone: (916) 447-9299
Fax: (916) 557-1118
john@balazslaw.com

Attorney for Defendant
DWAYNE LAMONT SLATER

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:03-CR-00371-JAM |
|---|---|
| Plaintiff, | |
| v. | **Defendant Dwayne Slater's *Renewed* Motion to Reduce Sentence Under 18 U.S.C. § 3582(c)(1)(A)** |
| DWAYNE LAMONT SLATER, | |
| Defendant. | |

## I. Introduction and Motion

Defendant Dwayne Lamont Slater, through counsel, moves for an order reducing his 25-year sentence to time served under 18 U.S.C. §3582(c)(1)(A) for "extraordinary and compelling" reasons in light of the changes in the law under the First Step Act, his extraordinary rehabilitation, family circumstances, medical conditions, and all the sentencing factors set forth in 18 U.S.C. § 3553(a).

Slater pled guilty to multiple bank robberies and two § 924(c) counts. At the time of his sentencing, the two firearm counts were required to run consecutive to each other and to the sentences on all other counts. As part of the First Step Act,

however, Congress eliminated the mandatory consecutive "stacking" requirement. *United States v. Marks,* No. 03-CR-6033, 2020 WL 1908911, at *3 (W.D. N.Y. Apr. 20, 2020) ("the FSA requires the existence of a prior 924(c) conviction 'that has become final,' before 'stacking' can occur"). As a result, if Slater were sentenced today, he would almost certainly would have received a lower sentence. However, the First Step Act did not make this change retroactive. "Rather, the First Step Act increased the opportunity for defendants to obtain a reduction in their sentences based on an individualized consideration under designated criteria" set froth in § 3582(c)(1)(A)." *Id.*

Slater's conduct in prison has been exceptional and he poses little risk of danger to the community. In a recent progress report, his case manager concluded: "If ever there was an inmate who deserves a second chance, or an early release, it is Mr. Slater. I truly believe he is a different person now than when he was convicted, and I have no doubt he will be successfully upon his release." Exhibit 2, at 19. As set forth in this motion, his family circumstances and medical conditions also support a sentence reduction. Finally, Slater has a viable release plan; he can reside with his sister in Turlock who needs his help taking care of the family.

According to the Bureau of Prison's website, Slater's projected release date is January 30, 2025, meaning he has about 32 months remaining to serve on his 25-year sentence. In these circumstances, a modest sentence reduction to time served, with or without an additional term of home confinement as a condition of supervised release, will best serve the goals of the First Step Act and is consistent with all the sentencing factors in 18 U.S.C. § 3553(a).

                Respectfully submitted,

Dated: May 25, 2022

                /s/ John Balazs
                JOHN BALAZS
                Attorney for Defendant
                DWAYNE LAMONT SLATER

# MEMORANDUM OF POINTS AND AUTHORITIES

**I.     The First Step Act's elimination of the "stacking" requirement in § 924(c) cases, Slater's extraordinarily good conduct in prison, family circumstances, and medical conditions warrant reducing his sentence to time served under 18 U.S.C. § 3582(c)(1)(A).**

**A.     Procedural History**

Defendant Dwayne Slater pled guilty to nine counts of armed bank robbery and credit union robbery in violation of 18 U.S.C. § 2113(a), (d) and two counts of carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1). Docket 260. On April 29, 2010, the Court sentenced Slater to 300 months imprisonment, with 132 months on each bank robbery count to run concurrently with each other, and 84 months on the two § 924(c) counts to run consecutive to each other and to the 132-month term on the other counts. Docket 806. The Court also imposed a 60-month term of supervised release. Slater has been incarcerated at FCI Butner Medium I for several years.

Slater filed a prior motion for compassionate release on June 13, 2020. Docket 1166. The motion relied in large part on the outbreak of COVID-19 in the Butner prison complex and Slater's high-risk medical conditions (obesity, high blood pressure, prediabetes, congenital scoliosis, chronic pain, peripheral neuropathy, and history of renal failure). Docket 1166, at 11 & Exhibit 4 (under seal). The district court denied the motion under § 3553(a) in an order filed July 31, 2020. Docket 1992.

Slater now renews his earlier motion based on change in circumstances. First, he has served almost 22 more months in prison since his first motion to reduce sentence was denied. With a release date of January 30, 2025, Slater has a little more than 2 ½ years left on his 25-year sentence rather than more than four years at the time his initial motion was filed. Further, Slater has continued to demonstrate extraordinarily good conduct while in prison. Slater's sister also died in December 2021, leaving behind six grandchildren ranging from 5 to teenagers.

3

Slater is needed to help raise and support these six children who are currently being raised by his sister Laura Lambert in Turlock, California. The Court also granted a motion for a sentence reduction from a codefendant Kenneth Rodgers on March 1, 2022. Docket 1222. At this point, the § 3553(a) factors weight strongly in support of a small reduction in sentence to time served.

### B.   18 U.S.C. § 3582(c)(1)(A) gives the Court authority to reduce Slater's sentence of imprisonment to time served for "extraordinary and compelling reasons."

The Court should reduce Slater's sentence of imprisonment to time served under the "compassionate release" statute, 18 U.S.C. § 3582(c)(1)(A). The statute grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). The statute provides:

(1) in any case--

(A) *the court*, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, *may reduce the term of imprisonment* (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), *after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--*

*(i) extraordinary and compelling reasons warrant such a reduction; . . .*

*\*\*\*\*\**

*and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]*

18 U.S.C. § 3582(c)(1)(A) (emphasis added). Thus, the statutory requirements for sentence reduction are that the court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C.

§ 3553(a), and (3) ensure any reduction is consistent with applicable policy statements.

The compassionate release statute previously permitted sentence reductions only upon motion of the Director of the Bureau of Prisons. But Congress expanded the statute in the First Step Act of 2018. Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018). As amended, § 3582(c)(1)(A)(i), now permits courts to consider motions filed by the defendant so long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" Thus, Congress amended § 3582(c)(1)(A) to allow a defendant to seek a reduction directly from the Court, provided that the defendant first seeks a reduction from the BOP and that the request has been denied or 30 days have passed." *United States v. Aruda,* 939 F.3d 797, 799 (9th Cir. 2021).

**C.     The exhaustion requirement in § 3582(c)(1)(A) is satisfied.**

On April 24, 2020, Slater, through counsel, submitted an administrative request for transfer to home confinement under the CARES Act and for compassionate release under § 3582(c)(1)(A) to the FCC Butner Warden. Exhibit 1A. In a Memorandum dated May 5, 2020, Warden Sullivan responded that Slater did not meet the criteria for "priority" consideration to home confinement and that Slater may resubmit a § 3582(c)(1)(A) reduction in sentence. Exhibit 1B, at 5.

On March 29, 2022, Slater renewed his request to the Warden for a § 3582(c)(1)(A) sentence reduction on the grounds set forth in this motion. Exh. 1B, at 4. In a memorandum dated April 27, 2022, the Warden denied this request for a reduction in sentence. Exh. 1B, at 2-3. Slater thus has satisfied any "exhaustion" requirement in § 3582(c)(1)(A).

**D.     The Court has authority to find extraordinary and compelling reasons other than those expressly identified in commentary to U.S.S.G. § 1B1.13.**

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The policy statement issued in exercise of that authority, U.S.S.G. § 1B1.13, provides examples of "extraordinary and compelling reasons" in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served, or (4) compelling family circumstances. U.S.S.G. § 1B1.13 comment. n.1(A)-(C). The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13, comment. n.1(D).

However, the policy statement was last amended in November 2018, before the First Step Act was passed, and it still requires a motion filed by the BOP. For that reason, the Ninth Circuit held that "U.S.S.G. § 1B1.13 only applies to motions filed by the BOP Director and does not apply to § 3582(c)(1)(A) motions filed by a defendant." *Aruda,* 993 F.3d at 801. Thus, "[t]he Sentencing Commission's statements in U.S.S.G. § 1B1.13 may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding." *Id.; see Gunn,* 980 F.3d 1178, 1181 (7th Cir. 2020) ("District judges must operate under the statutory criteria—'extraordinary and compelling reasons'—subject to deferential appellate review."). "The legislative history of the First Step Act's compassionate-release amendment" shows the law seeks "to expand and expedite compassionate-release motions." *Aruda,* 993 F.3d at 801.

Although the compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction,

> [i]t bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in facts speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place. *Id.* Beyond this, a district court's discretion in this area—as in all sentencing matters—is broad. *See United States v. Cavera,* 550 F.3d 180, 188 (2d Cir. 2008) (en banc) (noting a district court's "very wide latitude" in sentencing). The only statutory limit on what a court may consider to be extraordinary and compelling is that "[r]ehabilitation *alone* shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t) (emphasis added).

*United States v. Brooker,* 976 F.3d 228, 234-37 (2d Cir. 2020) (footnote omitted).

### E. After the First Step Act, Slater's consecutive sentences on two § 924(c) firearm counts, his truly extraordinary rehabilitation, extraordinary family circumstances and medical conditions warrant reducing his sentence under § 3582(c)(1)(A).

#### 1. First Step Act's elimination of § 924(c)'s stacking rule.

Slater pled guilty to two § 924(c) counts and nine bank robbery counts. He was sentenced to 132 months on each of the bank robbery counts to run concurrent with each other and 84 months on each of the two § 924(c) firearm counts to run consecutive to each other and to the sentences on the bank robbery counts, for a total sentence of 300 months. At the time of his sentencing, the two firearm counts were required to run consecutive to each other and to the sentences on all other counts.

As part of the First Step Act, Congress eliminated the mandatory consecutive "stacking" provision that had been required for violations of § 924(c). *United States v. Marks,* No. 03-CR-6033, 2020 WL 1908911, at *3 (W.D. N.Y. Apr. 20, 2020) ("the FSA requires the existence of a prior 924(c) conviction 'that has become final,' before 'stacking' can occur"). In other words, if Slater were

sentenced today, his two 924(c) counts could have been run concurrently to each other; if so, he would have been sentenced to 18 years, instead of 25 years. "However, the First Step Act did not make this change retroactive; and the amendment does not automatically reduce the sentence imposed on defendants . . . who were sentenced before December 21, 2018, the First Step Act's effective date." *United States v. Redd,* No. 01:97-CR-0006-AJT, 2020 Wl 124893, at *3 (E.D. Va. Mar. 16, 2020). "Rather, the First Step Act increased the opportunity for defendants to obtain a reduction in their sentence based on an individualized consideration under designated criteria" set forth in § 3582(c)(1)(A). *Id.*

Numerous courts, including many in California, have held that the fact that a defendant would have received a lesser sentence if he were sentenced today based on changes in the law—along with other circumstances of a case—may represent extraordinary and compelling grounds to reduce a defendant's sentence under § 3582(c)(1)(A). *See, e.g., United States v. McCoy,* 981 F.3d 271, 286-87 (4th Cir. 2020); *United States v. Parker,* No. 2:97-CR-0202-TLN, 2021 U.S. Dist. Lexis 93528, 2021 WL 1966409, at *3 (E.D. Cal. May 17, 2021) (citing cases); *United States v. Smith,* 538 F.Supp.3d 990, 1000 (E.D. Cal. 2020).

**2. Slater's extraordinary rehabilitation also justifies a sentence reduction in combination with the other factors in this case.**

Although the statute states that a defendant's rehabilitation *alone* shall not be considered sufficiently extraordinary and compelling to justify compassionate release, the word "alone" indicates that "courts can consider rehabilitation as *part* of a compassionate release motion." *United States v. Brown,* No. 4:05-CR-0227, 2020 WL 2091802, at *7 (S.D. Iowa Apr. 29, 2020); *see United States v. Chan,* No. 96-CR-0094-JSW*,* 2020 WL 1527895, at *6 (N.D. Cal. Mar. 31, 2020) (concluding that defendant's rehabilitation efforts in combination with the amendments to § 924(c)'s stacking provisions . . . demonstrated extraordinary and compelling reasons to reduce his sentence on those two counts"); *Marks,* 2020 WL 1908911, at

8

*7 (collecting cases).

Here, Slater's prison conduct over more than 18 years has been nothing short of extraordinary and is a strong factor favoring a sentence reduction. Exhibit 2 contains records documenting Slater's prison performance and exceptional efforts at rehabilitation.[4] This includes a progress report (pp. 1-4), re-entry peer support course outline (pp. 5-9), Mr. Slater's letter to the court (pp. 10-16), BOP staff recommendation letters (pp. 17-20), Campbell Law School Restorative Justice Clinic records (photo, p.21; letters, pp. 22-32), a job offer upon release (p. 33), family and friends character letters (pp.34-52), and certificates and class records (pp. 53-74).[1]

Exhibit 3 likewise contains additional records demonstrating rehabilitation since Slater's initial motion was filed almost two years ago. These recent records show that Slater has continued his extraordinary efforts towards rehabilitation: Mr. Slater's 4/18/22 letter to the court (pp. 2-4); a 2/16/22 letter from the FCC Butner prison chaplain (pp. 5-6); a 3/9/22 letter from the prison's factory manager (p. 7); a 1/4/22 letter and photo from Mr. Slater's sister Laura Lambert (pp. 8-11); a 1/3/22 letter from Joseph Attaway Sr. (pp. 12-15); a 2/22/22 progress report (pp. 16-20); a 3/23/22 letter from Dominque Slater (pp. 21-25); a 4/11/22 letter from Clarence C. Atkinson II, CESCO (pp. 26-27); a 1/11/22 Memorandum from Richard McNeill, FMC Butner Safety Compliance Specialist (pp. 28-29); a Memorandum from Jonathan D. Johnson, a FCC Butner maintenance supervisor (p. 30); and a FCC Butner AARP foundational finance 50+ FSA program certificate (p.31).

His recent progress report recounts Slater's history in unusually positive terms. It notes that "Inmate Slater has incurred only one incident report during his incarceration. He used another inmate's phone account to communicate with his

---

[1] Exhibit 2 was previously submitted as Exhibit 5 to Slater's first § 3582(c)(1)(A) motion at docket 1166-5. For the court's convenience, it is attached as Exhibit 2 to this motion.

family during a family emergency. He readily accepted responsibility, admitting his guilt." Exh. 3, at 17. His case manager summarizes his prison conduct as follows:

> Inmate Slater is what many consider a "model inmate." He has always been respectful to staff and other inmates. He is pleasant and positive, always with an encouraging word or smile for others. Mr. Slater works hard to keep himself busy in a productive manner, by programming and maintaining a work assignment with much pride and humility. He often takes younger, less experienced inmates "under his wing" to assist them in adjusting to, and being successful while incarcerated. Furthermore, Mr. Slater continues to serve as a primary Peer Leader for the Circle Keepers Victim Impact program, which is led by staff and students from Campbell University Law School. He is reliable and takes great pride and ownership of the group. *If ever there was an inmate who deserves a second chance, or an early release, it is Mr. Slater. I truly believe he is a different person now than when he was convicted, and I have no doubt he will be successful upon his release.*

Exh. 3, at 19 (emphasis added). The progress report also notes that Slater "has a very extensive support system, consisting of family and friends. His release plan is with his sister in Turlock." *Id.*

FCC Butner prison staff have also written letters in support of Slater, which is quite extraordinary in and of itself. The prison chaplain, for example, states that over "the last six years, [he] has had the unique honor to know Mr. Slater to be a man of principle." Exh. 3, at 5. "Remorseful for the damage he has caused his community over twenty years ago," the chaplain "believe[s] Mr. Slater is ready to make a positive difference in society as he has in prison." *Id.* at 6. The FCC Unicor Factory Manager reports that Slater "is dependable, responsible, and honest and by far the most dedicated person I have come across. . . . I believe he will take the necessary steps moving forward in whatever decision is made for his future. According to our BOP guidelines, requirements, and polices, Mr. Slater has demonstrated the core values of behavior, programming, and character." *Id.* at 7.

The prison's Safety Compliance Specialist states that "Mr. Slater has displayed a professional attitude toward life and work without excuses." Exh. 3, at 28-29. And a FCC Butner maintenance supervisor adds that "Slater was working for the Safety Department during and throughout the COVID-19 pandemic and was a huge asset to FCI-1 Butner, . . . "put[ting] his own health and well being at risk to ensure the cleanliness and safety of the staff and inmates." Exh. 3, at 30.

Slater has also taken pride in his work with Campbell University Law School's restorative justice program. The program's director, students, and other workers have attested to how valuable he was in the program and the impact he had on others. One student (and future lawyer) credited Slater with "being a catalyst; he changed the trajectory of my life and the lives of others in the circle." Exh. 2, at 26-27. Another states that she "will never forget the gigantic impact that [Slater] has made on [her] life." Exh. 2, at 28. Yet another declared that Slater "is an amazing human who is committed to his healing, as well as the heal of those around him" and his "impact on my own life was more profound than I could have ever imagined." Exh. 2, at 31.

And Slater's actions have inspired other inmates in a way that should *reduce* recidivism. As one inmate explained,

> 2 years ago, Mr. Slater encouraged me to enroll in a victims impact-restorative justice group where he is a peer leader. This group has helped me in various ways in regards to better understanding the issues I've struggled with since my childhood, and how my crimes have impacted not just the victims in my offenses, but also my family and society as a whole. Mr. Slater also make sure he gets us involved in re-entry programs that are provided to us in here, so that we can prepare for our release. . . . A person like Mr. Slater would be an asset to society in dealing with at risk youth and adults as he has for many years come to recognize the error of his past ways . . . .

Exh. 2, at 48-49.

In his 4/18/22 letter to the Court, Mr. Slater expresses remorse for his past

11

misconduct and admits that his time in prison has helped him change his life:

> Sir, the time that I've spent in prison has helped me to change my life. I've been mentoring the younger inmates here, participating in different groups and programs, becoming a peer group leader in the *Victim Impact Program.* I was in this group for 3 years and it helped me realize how my wrong-doing impacted society. It also showed and taught me how my beneficial changes will make a difference. This prison time has humbled me and allowed me to feel remorse for my past crimes. I've taken this time serious, and took every opportunity presented to me to change and make a difference in life. I am not the silly, irresponsible, arrogant, unremorseful human being that sat in your Court room many years ago. I've grown into a mature, responsible, remorseful man that I was raised to be. I don't blame anyone except myself anymore. I can't believe that I was that ignorant. My life is important. How people view me matters now. This is why I do things the right way now. I lead by example now and allow everyone to see the good in me. No one can say that I am still just all talk, because I show my changes through the way I carry myself and treat others that I am better than what I used to be.

Exh. 3, at 3.

Slater's family also recognize the change in him. All his family's letters (Exh. 2, at 34-55; Exh. 3, at 21-25) recognize a growth and maturity in Slater that wasn't present in his early years. *See, e.g.,* Exh. 2, at 5 ("I've known Dwayne nearly my whole life, 45 years. I've watched him become a man inside those walls. I truly believe he has learned from his mistakes and changed for the better."); *id.* at 45 ("I have known Dwayne for nearly two decades Your Honor . . . . It's amazing to me how much he has changed his life and gotten himself together. . . . I know that if you talk to him yourself and look at his record while he's been incarcerated then you will see with your own eyes and ears how much this man has changed."); *id.* at 42 ("We've all witnessed his transformation and we know that he's not perfect, but we love the change and the growth. . . . He took his prison sentence seriously and did all the things he needed to in order to change his life. The classes and programs he has been taking were the most important thing he could have done

while in prison to help him transform and get his life together."); *id.* at 43 ("I have no doubt in my mind that Dwayne has become much more mature due to the time he has had to reflect on his crimes. This time he can be an asset to society and become an advocate for at-risk youths.").

Overall, Slater's extraordinary rehabilitation in combination with the other factors in his case here constitute an "extraordinary and compelling reason" to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A).

### 3. Extraordinary family circumstances

The policy statement to U.S.S.G. § 1B1.13 provides a non-exhaustive list of examples of "extraordinary and compelling reasons" in its application notes. The examples include "compelling family circumstances." U.S.S.G. § 1B1.13, comment. n.1 (A)-(C). As set forth in Slater's own letter (Exh. 2, at 2-4), his sister Laura Lambert's letter (Exh. 2, at 9-11), and his brother-in-law Joseph Attaway's letter (Exh. 2, at 12-15), Slater's family circumstances, in combination with the other factors in his case, provide a compelling reason to reduce his sentence. Slater's sister died on November 26, 2021, leaving behind six grandchildren ranging from age 5 to teenagers that require responsible adult supervision. Exh. 3, at 2. Unfortunately, the children's parents are unable to serve as caregivers. Exh. 2, at 9, 12. And Slater's deceased sister's husband, Joseph Attaway, is disabled. Exh. 3, at 12-15.

Slater's sister, Laura Lambert, who has custody of the grandchildren, is in her 60s and needs Slater's help in raising them. Exh. 3, at 2, 4. She explains that "[t]he death of my sister has been devastating to our family and has changed and affected many lives:"

> Due to my advancing age, it is much harder on me in my 60's. I'm working to take care of all of us and will be raising these kids by myself. I genuinely require the assistance of my brother. His help would surely relieve much needed pressure from me. The kids love him, respect him, and listen to him. He has this impact on them from

13

> prison. Dwayne will be 55 years old in May of 2022. He's done nearly 19 years in prison, and isn't as young and healthy as he was when he went to prison. The changes that Dwayne has made in prison enable me to believe and trust in him.

Exh. 3, at 9. Slater's family circumstances and the need to help his sister raise and support his deceased sister's grandchildren further support a finding that there are "extraordinary and compelling" reasons to reduce his sentence.

### 4. Medical factors

Slater is 55 years old. He suffers from a number of medical conditions, including obesity, high blood pressure, prediabetes, congenital scoliosis, chronic pain, peripheral neuropathy, and history of renal failure. Docket 1166, at 11 & Exhibit 4 (under seal). These conditions put him at higher-risk of serious illness or death should he contract the coronavirus. *See, e.g., United States v. Bradley,* No. 2:14-CR-0293-KJM, Docket 69, at 9 (E.D. Cal. July 7, 2020) ("Defendant also argues persuasively that it is not any one of these conditions alone that creates a greater risk of suffering severe illness from COVID-19; instead it is the 'particular danger' he faces given his combined conditions of diabetes, hypertension, and asthma."). His health conditions also make him much less of a danger to society.

### F.  Reducing Slater's sentence a modest amount to time served is consistent with all the sentencing factors set forth in 18 U.S.C. § 3553(a).

Under all the circumstances in this case, the Court should conclude that the lengthy period of imprisonment that Slater has already served is sufficient to satisfy all the purposes of sentencing. Those factors include the nature and circumstances of the underlying offense, the need for the sentence imposed, the kinds of sentences available, the applicable sentencing range, pertinent policy statements, the avoidance of sentencing disparities, and the need to provide victims restitution. 18 U.S.C. § 3553(a).

### 1. Nature and circumstances of the offense and history and characteristics of the defendant.

Slater's conduct, criminal history, and the underlying bank robberies to which he pled guilty to are undoubtedly serious. He started getting into trouble after his father died of cancer when he was 10. PSR ¶¶ 154, 156. He admittedly made bad decisions on the streets, resulting in his 25-year sentence in this case. Slater, however, is now 55 with significant medical issues, including obesity, hypertension, a history of renal failure, scoliosis, chronic pain, and peripheral neuropathy. As noted above, his rehabilitation in prison has been exceptional. Significantly, he has no prison disciplinary record except for a single phone abuse violation. He also has taken numerous, substantial positive actions toward rehabilitation, including participating in restorative justice groups with victims, students, and members of the community. Exh. 2; *see also United States v. Parker,* 2020 U.S. Dist. Lexis 89904, at *32 (C.D. Cal. May 21, 2020) ("evidence of postsentencing rehabilitation may plainly be relevant to 'the history and circumstances of the defendant.'") (quoting *Pepper v. United States,* 562 U.S. 476, 491 (2011)).

### 2. Need for the sentence imposed.

The government is expected to argue that Slater's criminal history and the underlying bank robbery offenses to which he pled guilty in this case warrant denying any sentence reduction. Although the underlying offenses were serious and warranted a significant prison sentence, his offenses occurred long ago and he has already been very, harshly punished. Slater has been in continuous custody since October 2003; he has already served over 18 ½ years in prison and the equivalent of a 21-year prison sentence with good time credits. Along with the other factors in this case, such a sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment and adequate deterrence. 18 U.S.C. §§ 3553(a)(1), (2).

Slater will also be supervised by a probation officer while on supervised

15

release for 60 months after his release and the Court can impose an additional term of home confinement as a condition of his release. *See United States v. Marks,* No. 03-CR-6033, 2020 WL 1908911, at *15 (W.D. N.Y. Apr. 20, 2020) (finding that any risk of danger "can be further mitigated by supervised release"). Slater can reside with his sister Laura Lambert in her home in Turlock, California. Exh. 1A; Exh. 1B, at 4; Exh. 3, at 9-11. Like other family members and friends, Ms. Lambert wrote a very thoughtful letter about the changed man her brother has become in prison. Exh. 2, at 41-42. Given his age, lengthy period of blemish-free incarceration, significant health issues, and a stable residence where he can be supervised by the probation office, Slater poses little danger to the community once released to home confinement or supervised release. Overall, reducing Slater's 25-year sentence a modest amount to time served (with an additional period of home confinement during his term of supervised release if the Court deems appropriate), would be "sufficient, but not greater than necessary, to comply with" all the purposes of sentencing under § 3553(a).

### III. Conclusion

For these reasons and those in his motion to reduce sentence, the Court should grant defendant Dwayne Lamont Slater's motion to reduce sentence to time served under 18 U.S.C. § 3582(c)(1)(A).

Respectfully submitted,

Dated:  May 25, 2022          /s/ John Balazs
                              JOHN BALAZS

                              Attorney for Defendant
                              DWAYNE LAMONT SLATER